## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| Joy Marshall, individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>     vs.<br><br>WebMD LLC,<br><br>          Defendant. | Case No. 8:21-cv-00683-WFJ-SPF<br><br><br>**Class Action** |

### DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT AND MEMORANDUM OF LAW

Pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure, Defendant WebMD LLC ("WebMD") moves to dismiss Plaintiff's First Amended Class Action Complaint (Dkt. 11) ("FAC"), and in support thereof, submits the Memorandum below.

### INTRODUCTION

Website owners routinely monitor usage of their own websites to improve user experience and functionality.  This is one of numerous cases filed by Plaintiff's counsel seeking to criminalize this practice under the Florida Security of Communications Act ("FSCA"), Fla. Stat. Ann. § 934.01 *et seq.*,[1] and is part of a larger movement by the plaintiffs' bar attempting to criminalize this practice pursuant to other states' laws (over 15 such cases have been filed in California).  However, as

---

[1] *See Holden v. Banana Republic, LLC*, Case No. 3:21-cv-00268-BJD-JRK, Dkt. 16 (Notice of Related Cases).

WebMD previously argued in its motion to dismiss the initial complaint, WebMD is not subject to personal jurisdiction in Florida based on Plaintiff's allegations, and the FSCA does not apply to WebMD's alleged actions here.

Plaintiff's amended pleading is lengthier but not improved.  Plaintiff still fails to adequately plead this Court's jurisdiction over WebMD or state a claim.  Like much of her initial pleading, Plaintiff's newly added paragraphs must be disregarded because they are not about WebMD (*e.g.*, FAC ¶¶ 10-14); irrelevant to the determination of her claim (*e.g.*, FAC ¶¶ 23, 49-61); mischaracterize precedent (*e.g.*, FAC ¶¶ 6, 8); implausible or conclusory (*e.g.*, FAC ¶¶ 15, 62, 63, 84), or some combination thereof.

WebMD operates www.webmd.com, a website that makes health information available to the public for free.  WebMD uses a third party's "session replay" software to periodically assess website visitors' "interact[ions] with the website, their mouse movements and clicks, keystrokes, search terms, information inputted into the website, and pages and content viewed while visiting the website."  (FAC ¶ 5.) "Session replay" technology is a data analytics tool that is widely used by companies to enhance user experience and functionality of their websites.  *See Graham v. Noom*, 2021 WL 1312765, at *5 (N.D. Cal. Apr. 8, 2021) (dismissing plaintiff's similar eavesdropping claims brought under California's analogous statute and noting that session replay technology "provides a tool . . . that allows [a website] to record and analyze its own data in aid of [its] business.").  Although Plaintiff alleges in conclusory fashion that WebMD used this technology "for its own financial gain"

(FAC ¶ 6), the FAC contains no alleged *facts* supporting the claim made upon

information and belief that WebMD "used or attempt [*sic*] to use the electronic

communications it intercepted in order to market its services and goods to Plaintiff

and the Class members." (*Id.* ¶ 84.)  This omission is unsurprising: WebMD does not

have any goods or services to market.  (*See id.* ¶ 22 ("Defendant is an on-line publisher

of health-related news and information.").)  WebMD's sole "use" of the information

at issue is in the ordinary course of its business – to improve its website functionality –

which is an exception to FSCA.

Nonetheless, Plaintiff maintains that the alleged analytics on WebMD's

website constituted a violation of a criminal statute.  This theory of liability would

mean that thousands of businesses and governmental entities that use this sort of

technology solely to improve their websites' functionality are breaking the law and

subject to criminal penalties.[2]  Such an extension of FSCA goes far beyond the law's

intent, which references in its legislative findings "[o]rganized criminals" and an

intent to prohibit the use of unauthorized interceptions "in evidence in courts and

administrative proceedings."  Fla. Stat. Ann. § 934.01(2),(3).  Given the poor fit of

facts to law, Plaintiff fails to state a claim for her sole cause of action.

As a threshold matter, this Court lacks personal jurisdiction over WebMD, a

---

[2] Florida's Supreme Court has a search box in the center of its homepage that uses this technology. www.floridasupremecourt.org, last accessed April 29, 2021.  As a user inputs keystrokes in the search box, even before pressing "enter," the search box begins populating suggested results based on the user's keystrokes in a drop-down menu.  This is the same type of functionality Plaintiff alleges violates FSCA.

New York-based limited liability company organized in Delaware.  WebMD transacts no business with residents of Florida, and the Complaint does not allege otherwise.  Plaintiff alleges that WebMD "directs, markets, and provides its business activities throughout the State of Florida," but these generalized and conclusory allegations are insufficient to demonstrate personal jurisdiction.  (FAC ¶ 19.)  The fact that webmd.com is "available to residents of Florida," without more, is similarly unavailing.  (*Id.*)  For this reason, the FAC should be dismissed.

Second, Plaintiff fails to state a claim for a violation of Section 934.03 of FSCA.  The Eleventh Circuit's interpretation of the "business extension exception" applies squarely to Plaintiff's allegations here, and takes WebMD's actions out of the scope of the statute.  In addition, the information Plaintiff alleges WebMD intercepted – such as "mouse movements and clicks" (FAC ¶ 5) – do not qualify as the "contents" of a covered communication under the statute.  The FAC's new lengthy discussions of an alleged "parade of horribles" unconnected to WebMD (*id.* ¶¶ 7-14) and an alleged lack of consent that is irrelevant to the exception (*id.* ¶¶ 49-61) do not save her claim.

For these reasons, the Court should grant WebMD's motion to dismiss.

## ARGUMENT

## I.    FACTUAL BACKGROUND

### A.    Defendant WebMD

WebMD operates the website webmd.com, which provides visitors with

medical information.  WebMD is a limited liability company organized in Delaware with its headquarters in New York, New York.  (Declaration of Blake DeSimone ("DeSimone Decl.")  ¶ 2.)  WebMD's sole member is WebMD Health Corporation, which is incorporated in Delaware and has its headquarters in New York, New York.  (*Id.*)  WebMD does not charge consumers any usage, membership, or download fees for access to the information it publishes on its site.  (*Id.* ¶ 4.)

### B.   WebMD's Alleged Use of "Session Replay" Software and Services.

Plaintiff alleges that WebMD "utilized 'session replay' software to intercept Plaintiff's and the class members' electronic computer-to-computer data communications with Defendant's website, including how they interacted with the website, their mouse movements and clicks, keystrokes, search terms, information inputted into the website, and pages and content viewed while visiting the website."[3] (FAC ¶ 5.)  Although Plaintiff alleges that WebMD "did so for its own financial gain" (*id.* ¶ 6) and "[u]pon information and belief" that WebMD used the collected communications "to market Defendant's services and goods to Plaintiff and the Class members, and/or to sell the information to other parties" (*id.* ¶ 62), she offers no factual allegations stating, for instance, that she received or saw marketing from WebMD; that someone else received or saw marketing from WebMD based on Plaintiff's allegedly collected communications; or to whom WebMD allegedly sold

---

[3] Should this case proceed, WebMD will show that it had disabled the keystroke tracking feature.

or disclosed this information.[4]

Plaintiff has also asserted new allegations regarding "session replay" software generally, but they have no factual connection to webmd.com (other than the occasional conclusory reference).  (*See*, *e.g.*, FAC ¶¶ 10-14 (including, among other irrelevant references, an unnamed "example" of session replay software and a quotation from a complaint in an unrelated patent case).)  Similarly, Plaintiff attempts to bring session replay software within the ambit of a quotation from a Ninth Circuit case, but she overreaches.  The quotation from *Patel v. Facebook* (FAC ¶ 8) does not reference session replay software at all, as Plaintiff would have it, but rather "sense-enhancing thermal imaging," "GPS monitoring for extended periods of time," "vast quantities of personal information" stored in cell phones, and "technological advances in tracking cell-site location information."  932 F.3d 1264, 1273 (9th Cir. 2019).  Such uses of those particular technologies are orders of magnitude different from the website-improvement analytics used by WebMD, the Florida Supreme Court, and thousands of other businesses and government entities.

## C.    Plaintiff Joy Marshall

Plaintiff alleges she is a Florida resident who has visited webmd.com "numerous times" while in Florida, most recently "on or about December 2020."

---

[4] Plaintiff's use of "and/or" here and elsewhere in the FAC is indicative of the weakness and implausibility of her allegations.  *See Joe Hand Promotions, Inc. v. Creative Ent., LLC*, 978 F. Supp. 2d 1236, 1240 (M.D. Fla. 2013) ("The Complaint's usage of several 'and/or' conjunctions among other ambiguities, make the allegations against Defendants vague and ambiguous."), citing  *J & J Sports Prods., Inc. v. Torres*, 2009 WL 1774268 (M.D. Fla. June 22, 2009); *see also United States v. Bush*, 70 F.3d 557, 562 (10th Cir. 1995) (use of "and/or" is strongly disfavored because it creates unnecessary ambiguity).

(FAC ¶¶ 25-27.)  She alleges that during "one or more" of her visits to webmd.com, WebMD "utilized at least one session replay script to contemporaneously intercept the substance of Plaintiff's electronic communications with Defendant's website, including mouse clicks and movements, keystrokes, search terms, information inputted by Plaintiff, pages and content viewed by Plaintiff, and scroll movements, and copy and paste actions." (*Id.* ¶ 37.)  However, Plaintiff nowhere alleges that she input any personally identifiable information into webmd.com such as a name, social security number, or date of birth, nor does she identify *any* specific information that she either input into or clicked on the website.  She further does not allege that the "session replay" software recorded her geographic location, IP address, or any other personally-identifying information.  Finally, other than conclusory statements – which include the ambiguous phrase "and/or"[5] – she does not allege how she was affected, let alone harmed, in any way by the alleged conduct.

## II.    LEGAL STANDARD

A plaintiff seeking to establish personal jurisdiction "bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction."  *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009).  However, if a defendant challenges personal jurisdiction "by submitting affidavit

---

[5] See note 4, *supra*.  For example, Plaintiff alleges, "Defendant's surreptitious interception of Plaintiff's and the Class members' electronic communications caused Plaintiff and the Class members harm, including violations of their substantive legal privacy rights under the FSCA, invasion of privacy, invasion of their rights to control information concerning their person, and/or the exposure of their private information."  (FAC ¶ 63.)

evidence in support of its position," the plaintiff then bears the burden of producing evidence supporting jurisdiction. *Id.*  A federal district court in Florida may exercise personal jurisdiction over a nonresident defendant to the same extent that a Florida court may, so long as the exercise is consistent with federal due process requirements." *Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008).  "[T]he determination whether an exercise of personal jurisdiction comports with due process remains whether the defendant purposefully established minimum contacts in the forum State." *Asahi Metal Indus. Co. v. Super. Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 108–09 (1987).

A motion to dismiss pursuant to Rule 12(b)(6) "tests the legal sufficiency of a claim." *Kissimmee Motorsports, Inc. v. Polaris Sales, Inc.*, 2019 WL 3386965, at *2 (M.D. Fla. May 20, 2019), *report and recommendation adopted*, 2019 WL 3386999 (M.D. Fla. June 4, 2019).  A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A "threadbare" recitation of the elements of a cause of action does not suffice.  *Id*.  In other words, "conclusory allegations which merely track the statutory language" must be set aside.  *Beepot v. J.P. Morgan Chase Nat. Corporate Services, Inc.*, 57 F. Supp. 3d 1358, 1376 (M.D. Fla. 2014); *see also Warren Tech., Inc. v. UL LLC*, 962 F.3d 1324, 1328 (11th Cir. 2020) ("though a court considering a motion to dismiss generally accepts the non-moving party's allegations as true, a court is not required to credit 'conclusory allegations, unwarranted deductions of facts or legal

conclusions masquerading as facts.'"), quoting *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1262 (11th Cir. 2004).

Finally, the FSCA is a penal statute.  The FAC therefore implicates the rule of lenity, which is a "fundamental tenet of Florida law regarding the construction of criminal statutes, which weighs in favor of the defendant." *Polite v. State*, 973 So. 2d 1107, 1112 (Fla. 2007).  "In Florida, the rule is not just an interpretive tool, but a statutory directive." *Kasischke v. State*, 991 So. 2d 803, 814 (Fla. 2008).  The rule requires that "any ambiguity or situations in which statutory language is susceptible to differing constructions must be resolved in favor of the person charged with an offense." *State v. Byars*, 823 So. 2d 740, 742 (Fla. 2002).  Although the applicability of the business extension exception, and the inapplicability of the statute based on the lack of "content" collected, are clear, to the extent the Court finds otherwise, it must interpret any ambiguity in WebMD's favor.

## III.   WEBMD IS NOT SUBJECT TO PERSONAL JURISDICTION IN FLORIDA.

Plaintiff's claims against WebMD must be dismissed because the Court cannot exercise personal jurisdiction over WebMD.[6]  *See Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.*, 137 S. Ct. 1773, 1780 (2017).  Plaintiff has not pled facts sufficient to support the exercise of specific personal jurisdiction over WebMD.[7]

---

[6] WebMD has not waived its right to challenge this Court's jurisdiction by removing this case from state court.  *Obermaier v. Kenneth Copeland Evangelistic Ass'n, Inc.*, 208 F. Supp.2d 1288, 1290 (M.D. Fla. 2002).
[7] Plaintiff does not allege that WebMD is subject to general personal jurisdiction in Florida—likely because it is not.  WebMD is organized in Delaware and headquartered in New York.  (DeSimone Decl. ¶ 2.)  Its sole member is a Delaware corporation also based in New York.  (*Id.*)

**A.     WebMD Is Not Subject to Specific Personal Jurisdiction in Florida.**

WebMD is not subject to specific personal jurisdiction in Florida because

Plaintiff has not pled, and cannot plead, sufficient facts showing the exercise of

jurisdiction would be proper.  In the Eleventh Circuit, specific personal jurisdiction

over a non-resident corporate defendant exists when (1) the defendant "purposefully

avails itself of the privilege of conducting activities within the forum . . . thus

invoking the benefits and protections of its laws;" and (2) "the defendant's contacts

with the forum . . . relate to the plaintiff's cause of action or have given rise to it."

*Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1220 (11th Cir. 2009).

Additionally, the exercise of jurisdiction over the defendant must comport with

notions of "fair play and substantial justice." *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d

1209, 1221 (11th Cir. 1999).

Here, Plaintiff's jurisdictional allegations do not establish that the Court's

exercise of specific personal jurisdiction over WebMD would be appropriate.

**1.     WebMD Did Not Purposefully Direct Its Actions at Florida.**

Plaintiff has not pled facts showing that WebMD purposefully directed any

actions toward Florida.  Where a defendant's conduct took place outside the forum,

purposeful direction is assessed by examining the effects of that conduct inside the

forum state."  *Oldfield*, 558 F.3d at n.28.  Whether the alleged "effects" are sufficient

to confer jurisdiction is determined using the test articulated in *Calder v. Jones*, 465

U.S. 783 (1984), which requires that the nonresident defendant have (a) "committed

an intentional tort" (b) "that was directly aimed at the forum," (c) "causing an injury

within the forum that the defendant should have reasonably anticipated." *Id.* Here, Plaintiff cannot satisfy any prong of the *Calder* test because WebMD's alleged actions were not taken in Florida, were not directly aimed at Florida, and did not cause any injury in Florida that WebMD could have "reasonably anticipated." Additionally, WebMD operates a purely informational website that is insufficient to invoke Florida's jurisdiction under the "sliding scale" test articulated in *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997).

> **(a)     The Only Alleged Intentional Acts by WebMD Took Place Outside of Florida.**

Plaintiff does not allege that WebMD took any suit-related action in Florida. Plaintiff alleges only two intentional acts by WebMD related to her alleged injury: (1) the operation of www.webmd.com; and (2) the use of "session replay" software on webmd.com. (FAC ¶¶ 5, 24.) Neither of these alleged acts took place in Florida. Plaintiff's sparse allegations do not alter the facts that WebMD – a company based outside of Florida – used software on a website hosted outside the state. (*Id.* ¶¶ 5, 18.)

Plaintiff does not (and cannot) allege that WebMD has any offices in Florida, hosts any servers in Florida, stores data from "session replays" in Florida, or invited Plaintiff to visit its site through advertising in Florida or otherwise. Plaintiff asserts, in conclusory fashion, that WebMD "directs, markets, and provides its business activities throughout the State of Florida," that its website is "available" to Florida residents, and that Plaintiff happened to be in Florida when she chose to navigate to

webmd.com.  (FAC ¶¶ 19, 27.)   These conclusory assertions are insufficient to establish the requisite "intentional conduct" for this Court's exercise of personal jurisdiction.  *Walden v. Fiore*, 571 U.S. 277, 286 (2014) ("A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on *intentional conduct* by the defendant that creates the necessary contacts with the forum." (emphasis added)).  Plaintiff has not pled any facts concerning WebMD's purported "business activities" in Florida or that WebMD took any other intentional actions in Florida.  Thus, she cannot satisfy this prong of the *Calder* test.

### (b)   WebMD's Actions Were Not "Directly Aimed" at Florida.

Plaintiff does not make any allegations regarding how WebMD purportedly targeted Florida, which is fatal to demonstrating a "direct aim" by WebMD.  *Full Sail, Inc. v. Spevack*, 2003 WL 25277185 at *6 (M.D. Fla. 2003) is instructive.  There, this Court held that the defendant, who operated a website containing allegedly defamatory information, was not subject to personal jurisdiction in Florida.  In doing so, this Court reasoned that the defendant's website was not "expressly aimed at Florida" because it targeted "readers in all 50 states."  *Id.*  The rationale of *Full Sail* applies here.  Webmd.com is accessible worldwide and provides health information to a general audience for free.  (DeSimone Decl. ¶¶ 3-4.)  It does not tailor the health information it provides to website visitors in Florida.  (*Id.* ¶ 9.)  Plaintiff does not allege otherwise, and so she cannot satisfy the "direct aim" prong of the *Calder* test.

**(c)     Plaintiff has not Suffered any Injury that WebMD could have "Reasonably Anticipated."**

In addition, Plaintiff has not pled any facts demonstrating that she suffered an injury in Florida that WebMD could have "reasonably anticipated."  Indeed, the only "damages" Plaintiff alleges are that WebMD's use of session replay software purportedly caused "injuries including violations of [her] substantive legal privacy rights under the FSCA, invasion of [her] privacy, and potential exposure of [her] private information."  (FAC ¶ 15.)  This conclusory allegation is insufficient to demonstrate that WebMD could have "reasonably anticipated" Plaintiff being injured in Florida.  The Complaint provides no detail about what "substantive legal privacy rights" were purportedly "violat[ed]" by WebMD—or how unspecified "private information" was "potential[ly]" exposed.  Accordingly, Plaintiff has not satisfied this prong of the *Calder* test either.

**(d)     Plaintiff Has Not Demonstrated Purposeful Availment Under the *Zippo* Test.**

Plaintiff cannot demonstrate purposeful availment under the test articulated in *Zippo*, 952 F. Supp. at 1124, because WebMD operates a passive, non-commercial website.[8]  *Zippo* contemplates a sliding scale of internet-based commercial activity to determine whether the exercise of personal jurisdiction over a defendant is appropriate.  *Schuster v. Carnival Corp.*, 2011 WL 13220428 at *7 (M.D. Fla. Feb. 3,

---

[8] The Eleventh Circuit has "acknowledged" but not expressly adopted the *Zippo* framework.  *GLD, LLC v. Gold Presidents, LLC*, 2021 WL 148737 at n.2 (S.D. Jan. 15, 2021).  However, District Courts within Florida have applied the *Zippo* test to determine whether operating a website constitutes purposeful availment.  *Id.*

2011).  At one end of the scale there are "passive" websites that only make "information available to those interested in viewing the web site in foreign jurisdictions."  *Miami Breakers Soccer Club v. Women's United Soccer Ass'n*, 140 F. Supp. 2d 1325, 1329 (S.D. Fla. 2001).  Operation of a passive website does not support the exercise of jurisdiction.  *Id.*  For example, this Court held that the operator of an "allegedly infringing website" was not subject to personal jurisdiction because the defendant's website did not allow consumers to purchase products.  *Volt v. Volt Lighting Group LLC*, 369 F. Supp. 3d 1241, 1248 (M.D. Fla. 2019).  On the other end of the scale, there are "active" websites that allow "for those interested in foreign jurisdictions to enter into contracts over the Internet with the defendant," which can support the exercise of jurisdiction.  *Miami Breakers*, 140 F. Supp. 2d at 1329.

Webmd.com falls squarely into the "passive" category of websites.  WebMD makes free health information "available to those interested in viewing" its website.  (DeSimone Decl. ¶¶ 3-4; *Miami Breakers*, 140 F. Supp. 2d at 1329; *see also* FAC ¶ 22 ("Defendant is an on-line publisher of health-related news and information.").)  And like the defendant's website in *Volt*, webmd.com does not allow its users to enter into contracts over the internet because it does not offer any products or services.[9]

---

[9] Webmd.com does contain a single page – located at webmd.com/labs/ordertests-main – that permits users to sign up for and pay for STD testing.  (DeSimone Decl. ¶ 7.)  However, the lab testing product, transaction, and webpage are entirely within the control and ownership of a third-party vendor, PWNHealth.  (*Id.*)  WebMD does not engage in any financial transaction with website visitors who purchase lab testing from PWNHealth.  (*Id.*)  In addition, the alleged "session replay" software was never embedded on the lab testing page because all of the pages related to lab testing are hosted by PWNHealth, not WebMD.  (*Id.* ¶ 8.)  Thus even if any consumer transactions related to lab testing were to be imputed to WebMD – which they should not be – they are unrelated to Plaintiff's allegations and therefore irrelevant to the specific jurisdiction analysis.

(DeSimone Decl. ¶¶ 5-6.)  Plaintiff pleads no facts demonstrating *any* "commercial" activity on webmd.com involving Florida citizens that could support a finding of "purposeful availment."  Accordingly, the exercise of jurisdiction over WebMD would be inappropriate under the *Zippo* test as well.

For all of these reasons, Plaintiff cannot establish that WebMD purposefully directed its challenged activity at Florida sufficient to confer personal jurisdiction. This failure compels dismissal without leave to amend.

### 2.    Plaintiff's Claims Do Not Arise Out of or Relate to Forum-Related Activities by WebMD.

Plaintiff has also failed to plead facts showing that her claim arises out of WebMD's activities in Florida.  To satisfy this prong of the analysis, Plaintiff must plead facts demonstrating "an adequate link" between WebMD's contacts with the forum and the claims at issue.  *Bristol-Myers*, 137 S. Ct. at 1781.  The relevant inquiry is "whether a defendant's conduct connects [it] to the forum in a meaningful way." *Walden*, 571 U.S. at 290.

The reasoning of *Walden* applies here.  In *Walden*, the Supreme Court held a Nevada court could not exercise personal jurisdiction over a non-resident defendant because the plaintiff's claims did not arise from the defendant's actions in Nevada. The plaintiff alleged that the defendant, a police officer in Georgia, improperly seized his cash at an Atlanta airport.  *Id.* at 280–81.  In holding the district court could not exercise personal jurisdiction over the defendant, the Supreme Court reasoned that the harm the plaintiff purportedly suffered – not having access to his cash – was not

"tethered to Nevada in any meaningful way." *Id.* at 291.  The Court observed that because the plaintiff would have experienced the same injury in "Florida, Mississippi, or wherever else they might have traveled," the plaintiff's claims did not arise from the defendant's contact with Nevada.  *Id.*

Here, Plaintiff similarly fails to establish that her claims either "arise from" or relate to WebMD's activities in Florida.  Plaintiff virtually traveled out of Florida to visit a website hosted elsewhere.  She would have experienced the same injury she alleges in the Complaint by visiting webmd.com from any state.  Because the alleged harm Plaintiff purportedly suffered is not "tethered" to Florida "in any meaningful way," her claims do not arise from WebMD's activities in Florida and should be dismissed for this independent reason as well.  *See Volt*, 369 F. Supp. 3d at 1248 (finding no jurisdiction because the plaintiff did not satisfy "*Walden*'s command that [the defendant] must have intentionally created a connection with Florida.").

### 3.   The Exercise of Jurisdiction Over WebMD in Florida Is Not Reasonable.

This Court's exercise of personal jurisdiction over WebMD would not comport with "traditional notions of fair play and substantial justice." *Oldfield*, 558 F.3d at 1221.  WebMD is a limited liability company organized in Delaware with its headquarters in New York, New York.  (DeSimone Decl. ¶ 2.)  WebMD's sole member is WebMD Health Corporation, which is incorporated in Delaware and has its headquarters in New York, New York.  (*Id.*)  It would be unreasonable to require WebMD to come to Florida to defend itself when Plaintiff's claims do not arise out

of any actions taken by WebMD in Florida. *See Oldfield*, 558 F.3d at 1222 (declining to exercise jurisdiction where the plaintiff's suit did not arise out of the defendant's actions in Florida.) Even assuming Plaintiff could show purposeful availment and that her suit arises out of WebMD's actions in Florida, the Court should decline to exercise jurisdiction based on a lack of reasonableness. Plaintiff has not alleged any facts demonstrating that WebMD targeted Florida, and so WebMD should not be subject to the "unique burden" of defending itself "in a foreign legal system." *Asahi*, 480 U.S. at 114. Moreover, to rule that personal jurisdiction exists here would mean that every owner of a passive website is subject to personal jurisdiction in every state where residents can access the internet, which would be inconsistent with due process. The Court should therefore grant WebMD's motion to dismiss.

## IV. THE COURT SHOULD DISMISS THE COMPLAINT BECAUSE PLAINTIFF FAILS TO STATE A FSCA CLAIM.

### A. WebMD's Alleged Actions Were Not an "Interception" Under the FSCA Because the "Business Extension Exception" Applies.

The FSCA contains a statutory exception known as the "business extension exception" that prohibits claims based on routine business behavior that has caused no injury or damage. Fla. Stat. Ann. § 934.02(4)(a). Plaintiffs' claim falls squarely within this exception. Established precedent compels dismissal of the Complaint, particularly when combined with the mandatory application of the rule of lenity.

In *Royal Health Care Services, Inc. v. Jefferson-Pilot Life Ins. Co.*, the Eleventh Circuit held:

> The exception has two prongs.  First, the communication must be intercepted by equipment furnished by a provider of wire or electronic communication service in the ordinary course of its business.  Second, the call must be intercepted in the ordinary course of business.

924 F.2d 215, 217 (11th Cir. 1991).  In *Royal Health*, the plaintiff health care services provider alleged that the defendant insurance company had violated FSCA by recording its phone call to the plaintiff without notification or consent.  *Id.* at 216. While a provider of wire or electronic communication service furnished the telephone service, Plaintiff argued that a tape recorder, which was not furnished by a communications provider – intercepted the call.  *Id.*  The court disagreed: "We believe the telephone extension intercepted the call, while the tape recorder recorded it."  *Id.*  The court explained, "Federal case law interpreting the Federal Wiretap Act lends further support to this conclusion."[10]  *Id.*, citing *Epps v. St. Mary's Hospital, Inc.*, 802 F.2d 412 (11th Cir. 1986) (finding the exception applied where the communication at issue was "received through a telephone console" and recorded by a tape recorder).

The Eleventh Circuit concluded that the second prong – that the interception occurred in the ordinary course of business – "is an easy one."  *Royal Health*, 924 F.2d at 218.  The recording was part of a standard quality control practice of the insurance company.[11]  *Id.*

---

[10] The Federal Wiretap Act's business exception is the same as the FSCA's.  Carol M. Bast, *Eavesdropping in Florida: Beware A Time-Honored but Dangerous Pastime*, 21 Nova L. Rev. 431, 465 n. 57 (1996); *see also* 18 U.S.C. § 2510(5)(a).

[11] The court also observed that the plaintiff did not contend that "the call was personal in nature." *Id.*  Plaintiff similarly has not alleged that she provided personally-identifying information to WebMD.  Furthermore, the "personal" distinction to which the court was referring arose out of

In *Stalley*, this Court followed *Royal Health* and its opinion was affirmed by the Eleventh Circuit. *Stalley v. ADS Alliance Data Systems*, 997 F. Supp. 2d 1259 (M.D. Fla. 2014), *aff'd*, 602 Fed. App'x. 732 (11th Cir. 2015). The plaintiff alleged that the defendant credit card company, ADS, violated FCSA by recording telephone calls without prior consent. *Id.* at 1262. The court explained that ADS recorded the calls "using a digital recording system, which ADS refers to as a 'logger,' that is integrated into the telephone system, and is made by and purchased from another company." *Id.* at 1261-62. The purpose of the "logging" was to "conduct analytics on each call and gives ADS the ability to ensure it is in compliance with policies and 'drive[] quality higher with associates.'" *Id.* at 1262. Following *Royal Health*, the *Stalley* court held, "[I]t is ADS's telephone system itself which intercepted the calls, not the recording device." *Id.* at 1269. In making this determination, the court found it "crucial" that "the loggers have no function unless they are attached to a telephone system," and "the logger [cannot] function by itself." *Id.*

As in *Royal Health*, the *Stalley* court found the telephone service was provided

---

cases where "personal" information was discussed on an otherwise "business" call, which took the communication out of the realm of the business exception. *See*, *e.g.*, 14B Fla. Jur 2d Criminal Law—Procedure § 978 ("The general rule is that if the intercepted call was a business call, then the monitoring of it was in the ordinary course of business, under the business extension exception to the [FSCA]; conversely, if it was a personal call, the monitoring was probably, but not certainly, not in the ordinary course of business."), citing *Stalley v. ADS Alliance Data Systems, Inc.*, 997 F. Supp. 2d 1259 (M.D. Fla. 2014), *aff'd*, 602 Fed. App'x. 732 (11th Cir. 2015). Even assuming *arguendo* that Plaintiff communicated "personal" information while she was on webmd.com, the interactions that she allegedly had with WebMD are squarely within WebMD's ordinary course of business: the provision of free medical information without having to provide personally-identifying information such as a name or email address. In other words, she has alleged the website version of an entirely "business" call.

by a provider of wire or electronic communications, and that the "interception" was made in the ordinary course of business. *Id.* at 1270-72. The court further observed that the plaintiffs provided no evidence "that the constant recording was for anything but ADS's business." *Id.* at 1271.

As in *Royal Health* and *Stalley*, the business extension exception applies. Regarding the first prong, Plaintiff alleges that her "use, interaction, and communication with Defendant's website" was intercepted. (FAC ¶ 41.) That use, interaction, and communication necessarily took place over an internet connection, which was furnished to plaintiff and WebMD by internet service providers (ISPs). That internet connection is akin to the telephone service in *Royal Health* and *Stalley*. *See, e.g.*, *U.S. v. Warshak*, 631 F.3d 266, 286 (6th Cir. 2010) (an "ISP is the functional equivalent of a post office or a telephone company."). Regardless of which ISP Plaintiff used, providing a connection that allows a user to access websites is an ISP's ordinary course of business. Here, applying the Eleventh Circuit's reasoning in *Royal Health* and when it affirmed this Court in *Stalley*, the ISP's communications mechanism – the internet connection – intercepted Plaintiff's interactions with WebMD. (FAC ¶ 25 ("Over the past year, Plaintiff visited Defendant's website numerous times.").) Plaintiff has added allegations attempting to plead around this binding precedent, but her conclusory statements that the script, rather than the communications medium (*i.e.* the telephone in *Royal Health* and *Stalley* and the internet connection here) did the intercepting cannot controvert applicable law. (FAC ¶¶ 42, 47.)

This conclusion is further confirmed by the fact that just as the "logger" in *Stalley* could not function on its own, a "crucial" point on which the Court relied, here the script – "a text computer code instruction" (FAC ¶ 47) – could not function without an internet connection. Without the internet connection provided by her ISP that allowed her to access webmd.com (and allegedly trigger the code), the code would have nothing to allegedly record.[12] Therefore, as in *Royal Health* and *Stalley*, the first prong of the business extension exception is met.

The second prong is similarly satisfied. Plaintiff alleges not only that WebMD "intercept[ed]" her interactions with the website "one or more" times (FAC ¶ 37), but also that it "similarly intercepted the electronic communications of at least 5,000 individuals located in Florida who visited Defendant's website." (*Id.* ¶ 46.) Plaintiff makes no allegation that WebMD selected her or any other putative class members specifically for the alleged interception, or had a non-business-related reason for using the software at issue. Rather, she "claim[s] that Defendants [*sic*] *routinely* intercept[] electronic communications" of website users (*id.* ¶ 69 (emphasis added)), and that the class is "so numerous" that joinder of all of them is impracticable. (*Id.* ¶ 66.) She further states that "[t]he session replay script(s) was always active and intercepted every incoming data communication to Defendant's website the moment

---

[12] The Complaint does not allege the existence of WebMD's third-party provider of the software, and WebMD therefore does not include it as part of the analysis at the pleading stage. In any event, the fact that a third party provided the "recording device" does not change the analysis. *See Nece v. Quicken Loans*, 2018 WL 1326885, *3 (M.D. Fla. Mar. 15, 2018) ("nothing in *Royal Health* suggests that the meaning of 'intercept' varies based on who supplies the recording device"); *Stalley*, 997 F. Supp. 2d at 1267-68 (device was provided by a separate company from the defendant).

a visitor accessed the site."  (FAC ¶ 31.)  In other words, the alleged "interception" was a "routine" part of WebMD's business.  Plaintiff's bare allegation to the contrary (FAC ¶ 34) is conclusory and unsupported by any factual allegations and must be disregarded under *Iqbal* and *Twombly*.[13]

Because Plaintiff's allegations satisfy FSCA's business extension exception, this Court should dismiss the Complaint.  Although WebMD believes there is no ambiguity as to the exception's applicability, should the Court find any such ambiguity, it must be resolved in WebMD's favor.  *Byars*, 823 So. 2d at 742.

### B.    WebMD Did Not Violate FSCA Because the Software Did Not Collect the "Contents" of Plaintiff's Purported Communications.

Even if the Court determines that the business exception does not apply, the claim fails for an independent reason: plaintiff failed to plausibly allege that WebMD intercepted the "contents" of an electronic communication.  Fla. Stat. Ann. § 934.02(3).  "Contents," in the context of an electronic communication, means "any information concerning the substance, purport, or meaning of that communication." *Id.* § 934.02(7).  To interpret the FSCA's definition of "contents," courts look to interpretations of the analogous provision in the federal wiretap act, as it is identical. *See* 18 U.S.C. § 2510(8) ("contents" in the context of a covered electronic communication is "any information concerning the substance, purport, or meaning

---

[13] Plaintiff's newly-extensive allegations that WebMD did not notify her of the "recording" or obtain her consent (FAC ¶¶ 49-61) are irrelevant to the business exception analysis.  *See Sinopoli v. Cendant Mortgage Corp.*, 2006 WL 8439924, *6 (M.D. Fla. Mar. 31, 2006) ("It is not necessary that plaintiff have been warned that the call was being recorded.").

of that communication."); *see also Mitchell v. State*, 25 So. 3d 632, 635 (Fla. Dist. Ct.

App. 2009) ("our statutory scheme is so similar to the federal statute").  Thus,

"contents" means "the intended message conveyed by the communication . . . ."  *In*

*re Zynga Privacy Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014).  "Contents" does not

include "information regarding the characteristics of the message that is generated in

the course of the communication" such as "the name, address, and subscriber

number or identity of a subscriber or customer."  *Id.*  (citation omitted); *see also United*

*States v. Sigouin*, 2019 WL 7372958, *6 (S.D. Fla. Dec. 31, 2019) (software that

logged pieces of data such as the computer's IP address, the date and time, and the

number and identity of a person's neighbors was not capturing "contents"); *Minotty*

*v. Baudo*, 42 So. 3d 824, 830 (Fla. Dist. Ct. App. 2010) ("physical conduct recorded

on silent videotapes does not convey the *substance* of a particular communication.").

Here, Plaintiff fails to plausibly allege that WebMD captured the "contents" of

any of her purported communications.  She alleges WebMD captured "mouse clicks

and movements," "pages and content viewed," "scroll movements," and "copy and

paste actions."  (FAC ¶ 28.)  However, none of those vague actions constitute any

intended message.  Nor do Plaintiff's allegations that she typed unidentified

"keystrokes" or "inputted" unspecified information or search terms to the website

support a reasonable inference that WebMD collected anything qualifying as the

"contents" of a communication.  (*Id.*)[14]  To the extent there is any ambiguity in the

---

[14] These allegations are further weakened by more of Plaintiff's "and/or" pleading: "The commands
were sent as messages instructing Defendant's website what content was being viewed, clicked on,

interpretation of "contents," the Court must apply the rule of lenity and resolve such ambiguity in WebMD's favor.  *See Byars*, 823 So. 2d at 742.

Because Plaintiff has failed to plausibly allege the interception of communication "contents," the Court should dismiss the Complaint.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, this Court should dismiss Plaintiff's Complaint with prejudice.

### <u>Local Rule 3.01(g) Certification</u>

In accordance with Local Rule 3.01(g), counsel for the parties conferred regarding WebMD's anticipated motion to dismiss, via telephone and follow-up emails.  The parties were unable to reach an agreement and Plaintiff opposes WebMD's motion.

Dated:  May 5, 2021                      Respectfully submitted,

                                        */s/ Traci T. McKee*
                                        Traci T. McKee (FBN 53088)
                                        *traci.mckee@faegredrinker.com*
                                        **FAEGRE DRINKER BIDDLE & REATH LLP**
                                        1500 K Street NW, Suite 1100
                                        Washington, D.C. 20005
                                        Telephone:   +1 202 842 8800
                                        Facsimile:    +1 202 842 8465

                                        ***Attorneys for Defendant WebMD LLC***

---

requested and/or inputted by Plaintiff."  (*Id.*)  This same paragraph evinces additional ambiguity as to the device Plaintiff was allegedly using less than six months ago to visit webmd.com multiple times: "During her visits to the website, Plaintiff's computer and/or mobile device transmitted electronic communications…."  (*See also* FAC ¶ 38.)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on **May 5, 2021**, I filed the foregoing in the

CM/ECF system which will serve electronic copies upon all counsel of record:

**SHAMIS & GENTILE, P.A.**
Andrew J. Shamis, Esq.
Florida Bar No. 101754
Garrett O. Berg, Esq.
Florida Bar No. 1000427
14 NE 1st Avenue, Suite 705
Miami, Florida 33132
Tel.      (305) 479-2299
Fax.      (786) 623-0915
Email:   *ashamis@shaimisgentile.com;*
*gberg@shamisgentile.com*

**HIRALDO P.A.**
Manuel Hiraldo, Esq.
Florida Bar No. 030380
401 E. Las Olas Blvd., Suite 1400
Fort Lauderdale, FL 33301
Tel.      (954) 400-4713
Email:   *MHiraldo@Hiraldolaw.com*

**EDELSBERG LAW, PA**
Scott Edelsberg, Esq.
Florida Bar No. 100537
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
Tel.      (305) 975-3320
Email:   *scott@edelsberglaw.com*

*/s/ Traci T. McKee*
Traci T. McKee (FBN 53088)
*traci.mckee@faegredrinker.com*
**FAEGRE DRINKER BIDDLE & REATH LLP**
1500 K Street NW, Suite 1100
Washington, D.C. 20005
Telephone: +1 202 842 8800
Facsimile: +1 202 842 8465

***Attorneys for Defendant***
***WebMD LLC***